| | | |
|---|---|---|
| **OCEAN SKY INTERNATIONAL, L.L.C., ET AL.** | * | **CIVIL ACTION NO. 18-0528** |
| **VERSUS** | * | **JUDGE TERRY A. DOUGHTY** |
| **THE LIMU COMPANY, L.L.C., ET AL.** | * | **MAG. JUDGE KAREN L. HAYES** |

# RULING

Pending before the Court is a Motion for Temporary Restraining Order and Request for Emergency Relief under the Temporary Restraining Order [Doc. No. 67] filed by Plaintiffs Suni Enterprises, Inc. ("Suni Enterprises"), and Ocean Sky International, Inc. ("Ocean Sky").

On September 19, 2019, Defendants The LIMU Company, LLC ("LIMU"), and Gary Raser filed an opposition memorandum [Doc. No. 69].

On September 23, 2019, with leave of Court, Plaintiffs filed a reply memorandum. [Doc. No. 72].

For the following reasons, Plaintiffs' motion is DENIED.

## I.    PERTINENT FACTS, ALLEGATIONS, AND PROCEDURAL HISTORY

LIMU, a Nevada limited liability company, is a multi-level marketing company – otherwise known as an "MLM" company – that manufactures and distributes nutrition, health, and wellness beverages worldwide. Defendant Gary Raser ("Raser") is the founder and CEO of LIMU and is a domiciliary of Florida. He founded LIMU in 2003 when he purchased the assets of a MLM which had closed down.

Operating out of Lake Mary, Florida, LIMU markets and sells products through a network of independent distributors, also called members or promoters ("promoters"). Promoters are remunerated pursuant to a "Compensation Plan," which provides for a structured series of rankings, commissions, and bonuses based upon their sales volumes, profits from the sales of other LIMU promoters, and a percentage of the sales of the "downline" with which they are associated. The "downline" refers to individuals who are aligned below a particular promoter. The downline may also be referred to as a "genealogy."

To become a promoter for LIMU, an individual must submit a "Distributor Application and Agreement" (although this is now known as a Promoter Registration and Agreement). By submitting the Distributor Application, promoters are required to purchase products in order to earn any commissions and are encouraged to purchase a $499.00 or $999.00 fast track pack ("Packs") to earn in all areas of compensation. Once he or she has purchased a Pack, the promoter may either resell the products to his or her customer base, or, in the alternative, may use the products.

By submitting the Distributor Application, promoters agree to LIMU's "Policies & Procedures," which govern the manner in which a promoter may operate his or her LIMU business and which are amended from time to time.

Upon receipt of the Distributor Application, LIMU enters the promoter's personal information into the company's database, creates an account, and assigns the promoter an identification number. Once completing that process, the promoter is then permitted to participate in LIMU's Compensation Plan.

Once the promoter receives his or her identification number, a contract is formed between LIMU and the promoter. The Distributor Application, Compensation Plan, and Policies &

Procedures collectively comprise LIMU's "Distributor Agreement." According to the terms of the Distributor Agreement, specifically Section 8(c)(ii) of LIMU's Policies & Procedures, a promoter may only be terminated for cause.

The Policies and Procedures require promoters to "operate their businesses and conduct themselves professionally and ethically." [Doc. No. 58-1, Exh. A, at § 2(i)]. These obligations include the following:

> ii. Represent The LIMU Company products and services completely and according to the information contained in The LIMU Company published literature, without making misleading or unauthorized claims[;]
>
> iii. Represent The LIMU Company's Prosperity Plan™ truthfully and without exaggeration to all prospective Promoters[;]
>
> iv. Fulfill all obligations associated with sponsoring other Promoters, including the use of their best efforts to provide supervision and training of sponsored Promoters[;]
>
> v. Become familiar with and abide by The LIMU Company Policies and Procedures, as amended from time to time and all applicable law, regulations and ordinances[;]
>
> vi. Always conduct your business fairly and honestly; deceptive or unfair activities, representations and/or omissions are unacceptable.

*Id.* at §2(i), ii-vi. LIMU also prohibits health claims regarding its products. *Id.* at §7(l) ("Federal, state and provincial laws limit the health and medical claims that can be made with respect to dietary supplements."). As such "[n]o product claims can be made by The LIMU Company Promoters other than those approved and provided by the Company in writing." *Id.*

In addition, promoters "are expressly prohibited from making any express and/or implied income claims," which can be either a "specific representation about the amount of

money that a Promoter has made, or will or could make" or a representation that "level of income that [could] be earned." *Id.*

LIMU provides strict requirements for "testimonials" or stories about a promoter's experience. *Id.* at §7(m). Promoters can only "indicate benefits that are consistent with those approved by LIMU and shown in Company-produced materials" and "must never include any claims that any LIMU Product will cure, treat, mitigate, or prevent any specific disease, injury, or illness." *Id.* Indeed, product testimonials "should never be used to claim LIMU has healed or affected any specific disease, injury or illness." *Id.*

If a promoter violates the Policies & Procedures, LIMU has "the right to immediately terminate any Promoter upon written notice, at any time, for cause, when The LIMU Company determines in good faith that the Promoter has violated the provisions of the Promoter Agreement, including the provisions of these Policies and Procedures." *Id.* at §8(c)(ii). Once terminated, the "Promoter waives all rights he or she may have, including but not limited to, property rights to his or her former downline organization and to any bonuses, commissions or other remuneration derived through his/her sales and/or the sales and other activities of his/her former downline organization." *Id.* at §8(c)(iii) (emphasis omitted). In the event a termination is "determined to be wrongful," the Promoter "shall be paid those commissions that were withheld during the period of termination[,]" which "shall be [the] Promoters' sole and exclusive remedy for wrongful termination." *Id.* (emphasis omitted).

In July 2003, Ocean Sky applied to join LIMU. In his discretion, Raser placed approximately 9,000 promoters downline to Ocean Sky. [Doc. No. 69-1, Raser Aff., ¶ 9]. Shannon Pardue and Rachette Pardue are the principals of Ocean Sky.

4

Also in 2003, Suni Enterprises became a LIMU promoter. Tommy Liles ("Liles") is the principal of Suni Enterprises. Liles is the father of Rachette Pardue.

In 2013, according to Raser, LIMU learned that Ocean Sky had produced videos on its YouTube channel ("The Dream Team"), which, it contends, included improper health and income claims. LIMU notified Ocean Sky via letter from its counsel of its concerns about these videos. [Doc. No. 67-4, Exh. D]. LIMU also held a telephone conference with Ocean Sky about the videos.

In August 2015, LIMU held what its terms an "alignment meeting' in Orlando with top leaders, including the Pardues. The purpose of the meeting was allegedly to ensure that top leaders were aligned with LIMU's "'vision, direction, message and effective business-building tactics.'" [Doc. No. 69-1, Raser Aff., ¶ 14 (quoting August 21, 2015 Ryan Barson email to Shannon Pardue)].

According to Plaintiffs, in November 2017, there was a fallout between the Pardues, Liles, and LIMU. They contend that Defendants sought to improperly and fraudulently excluded them from LIMU without cause because of their high income. [1]

Defendants contend that Plaintiffs were properly terminated under the Distributor Agreement for breaches of that agreement. Specifically, Defendants contend that Ocean Sky continued to publish videos making improper health and income claims and that Rachette Pardue provided a promoter downline to Ocean Sky with a link to material produced by Rita Elkins and which LIMU has prohibited its promoters from sharing since at least 2009. Defendants also

---

[1] The parties dispute whether Shannon Pardue produced a January 2017 video allegedly violative of LIMU policies and procedures. For the reasons discussed in the law and analysis section, the Court need not reach whether Plaintiffs have a substantial likelihood of success on the merits, but excludes this factual dispute. The Court has laid out the factual background and the parties' allegations, but the Court makes no credibility determinations or factual findings for purposes of this Ruling.

contend that Ocean Sky shared "non-compliant" documents. They further contend that they hired a third party to attend parties hosted by Ocean Sky to observe the Pardues and, as a result, learned that they were making improper claims.

A suspension letter issued from LIMU to Shannon Pardue on December 11, 2017. At the same time, both the Pardues and Liles, who did not receive any notice, were summarily cut off from their income.

On or about February 16, 2018, LIMU met with the Pardues and one of Liles' other daughters, Salien Liles, a promoter downline to Suni. Salien Liles allegedly admitted non-compliance with LIMU's BMW Club program, which allows promoters who reach and maintain at least the rank of $20,000, to elect to receive a $600 monthly bonus to use for the lease or purchase of a black BMW. Promoters who participate in the program must allegedly possess and drive the BMW. Regardless of her alleged admissions, Salien Liles is not a principal of Suni (or of Ocean Sky). She has her own independent distributorship.

On February 22, 2018, after his compensation had been cut off, Liles notified LIMU via email that he had turned in the license plate for the BMW he obtained through LIMU on February 20, 2018. After some investigation, Defendants contend that they learned Suni was not properly supervising promoters downline to it.

On March 12, 2018, Plaintiffs' distributorship positions were formally terminated by LIMU.

On April 19, 2018, Plaintiffs initiated this action against Defendants, asserting claims of breach of written contract against LIMU and Does 1-25 (Count I), breach of oral contract against LIMU and Does 1-25 (Count II), intentional misrepresentation—fraud against LIMU, Raser, and Does 1-25 (Count III), negligent misrepresentation against LIMU, Raser, and Does 1-

6

25 (Count IV), and detrimental reliance against LIMU (Count V). Plaintiffs sought compensatory damages, exemplary and punitive damages, and "[f]or such other and further relief as the Court deems just and proper." [Doc. No. 1, p. 13].

On September 12, 2018, Plaintiffs filed an Amended Complaint [Doc. No. 37], in which Plaintiffs asserted the same causes of action against the same Defendants.

On January 24, 2019, with leave of Court, Plaintiffs filed a Second Amended Complaint [Doc. No. 56]. In that pleading, Plaintiffs assert the same causes of action against the same Defendants, but further added request for a declaratory judgment against LIMU (Count VI) declaring that LIMU's non-solicitation clause cannot be enforced, and a second request for a declaratory judgment against LIMU (Count VII) declaring that LIMU cannot enforce a limitations of damages clause against Plaintiffs.

On September 11, 2019, Plaintiffs filed the instant Motion for Temporary Restraining Order and Request for Emergency Relief under the Temporary Restraining Order [Doc. No. 67]. Along with its memorandum, Plaintiffs submitted approximately 113 pages of exhibits and affidavit evidence to support their motion. Plaintiffs contend that, given their income at the time of termination, they believe that they should recover actual damages of $7,000,000, in addition to any award of punitive damages.

In their motion, Plaintiffs contend that in August 2019 they heard that Raser was selling LIMU's genealogy to a third-party purchaser.[2] As they contend this is the most valuable asset of

---

[2] In his declaration, Plaintiffs' counsel, Chris Wellman, explains that his firm represents many MLM companies and that an MLM's genealogy or "downline" is the "entire marketing arm" and that "without it the company has no operations, whatsoever." [Doc. No. 67-1, p. 2, ¶ 5]. He explains further that this is "because the only way an MLM company earns revenue is through the efforts of its distributors of buying, selling, and promoting the company's products. Most MLM companies, including LIMU, consider[] [their] genealogy as [their] most valuable, not only asset." *Id.*

LIMU, Plaintiffs became concerned that they would be unable to collect on any future judgment against the company.

Plaintiffs' counsel reached out to counsel for LIMU, who stated on or about August 16, 2019, that she was "'unaware of a transaction that would impact this litigation.'" [Doc. No. 67-1, Declaration of Chris Wellman, p. 3, ¶ 10].

On August 29, 2019, Plaintiffs learned that LIMU had entered into a merger with another MLM company named Ariix. *Id.* at ¶ 11. Plaintiffs believe that the transaction resulted in a transfer of LIMU's genealogy (its promoters) to Ariix for a sum of money and that the money was paid directly to LIMU's "principals." *Id.* at 14. Specifically, Plaintiffs allege that that they believe Ariix paid LIMU an "up-front" cash payment and that it also agreed to make a long-term payment directly to Raser over a period of time and that this long-term payment is the "bulk of the consideration." [Doc. No. 67-1, Wellman Declaration, p. 4, ¶ 14].

According to LIMU's website, LIMU has in fact "merged" with Ariix. [Doc. No. 67-5, Exh. D. screenshot of LIMU website]; *see also* https://www.thelimucompany.com/blog/2019/limu-and-ariix-merge-to-increase-sales-opportunities-for-representatives/, last visited 09/24/2019.

Wellman again contacted counsel for Defendants on September 4, 2019, asking her to verify "that the transaction did not involve sale of LIMU's genealogy" and "whether Raser received a position as part of the transaction." [Doc. No. 671, p. 5, ¶ 15]. He offered to make any such information "attorney eyes only," but counsel refused to provide the requested information, stating that he had not provided any information "to suggest a good faith belief on your part that LIMU or Gary [Raser] engaged in any improper behavior or structured a deal to avoid liability for the transaction. . . . the transaction has no impact on this litigation." [Doc. .No.

67-6]. Defendants have not provided further information or any documents, including a redacted or unredacted copy of the Asset Purchase Agreement.

Plaintiffs contend "that Defendants have committed a fraudulent conveyance" and pursuing a TRO to enjoin "Defendants from dispersing and/or using any proceeds from the sale of LIMU's genealogy." [Doc. No. 67, p. 4]. Additionally, Plaintiffs seek expedited discovery to determine whether a fraudulent conveyance has occurred.

On September 19, 2019, Defendants filed a memorandum in opposition [Doc. No. 69], responding that there is no emergency based on Plaintiffs' fear that they may not be able to collect on an uncertain judgment and that Plaintiffs have failed to meet their burden to obtain a TRO or injunctive relief.

On September 23, 2019, Plaintiffs filed a reply memorandum [Doc. No. 72]. In addition to the reply, Plaintiffs raised objections to some of the evidence relied upon by Defendants. [Doc. No. 72-5].

On September 26, 2019, Defendants filed a response to Plaintiffs' evidentiary objections.

## II.  LAW AND ANALYSIS

There are four prerequisites for the extraordinary relief of preliminary injunction or TRO. A court may grant such relief only when the movant establishes that:

(1) there is a substantial likelihood that the movant will prevail on the merits;

(2) there is a substantial threat that irreparable harm will result if the injunction is not granted;

(3) the threatened injury [to the movant] outweighs the threatened harm to the defendant; and

(3) the granting of the preliminary injunction will not disserve the public interest.

*Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *Canal Auth. of the State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (en banc). The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a TRO or preliminary injunction can be granted. *Mississippi Power and Light Co. v. United Gas Pipeline*, 760 F.2d 618, 621 (5th Cir. 1985); *Clark*, 812 F.2d at 993. Otherwise stated, if a party fails to meet any of the four requirements, the court cannot grant the TRO or preliminary injunction. Although courts generally hold a hearing on a request for injunctive relief, the Fifth Circuit has noted that preliminary injunctions may be denied without a hearing, despite a request for a hearing by the movant, when the written evidence shows the lack of a right to relief so clearly that receiving further evidence would be pointless. *See Commerce Park at DFW Freeport v. Mardian Constr. Co.*, 729 F.2d 334, 341 (5th Cir. 1984).

As to the requirement of irreparable harm, a movant must show that (1) the harm is imminent; (2) the injury would be irreparable; and (3) the movant has no other adequate legal remedy. *See Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). It must be remembered that "only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction." *Canal*, 489 F.2d at 573.

As a general rule, an injunction is not appropriate to secure post-judgment legal relief in the form of damages. *DeBeers Consol. Mines v. United States*, 325 U.S. 212, 219–23 (1945); *ITT Community Dev. Corp. v. Barton*, 569 F.2d 1351, 1360–61 (5th Cir.1978). "Such an injunction to secure future payment of possible money damages would be in the nature of a 'prejudgment attachment" requiring compliance with Fed. R. Civ .P. 64, and, "through that rule to the strictures of state law." *F.S.L.I.C. v. Dixon*, 835 F.2d 554, 560 (5th Cir. 1987).

On the other hand, the *Dixon* Court was

10

> unwilling to say that no circumstances could support an injunction to secure a legal remedy. For example, the Tenth Circuit has stated that "[d]ifficulty in collecting a damage judgment may support a claim of irreparable injury" and reinstated a preliminary injunction to prevent the corporate defendant in that case from selling its assets and distributing the proceeds to its members because such a distribution might render impossible the plaintiff's attempts to collect it back. *Tri-State Generation v. Shoshone River Power, Inc*., 805 F.2d 351, 355 (1986).

835 F.2d at 560 n.1.

In *Tri-State*, an electricity generating and transmission cooperative brought an action to enjoin sale of assets of one of its member cooperatives, Shoshone, to a private utility. The Tenth Circuit reversed the district court and granted a preliminary injunction until a trial on the merits after the district court failed to address any of the four factors. As to the issue of irreparable harm, Tri-State produced evidence that it may not be able to collect a judgment directly from Shoshone's successor and that allowing Shoshone to immediately sell its assets "would jeopardize the viability of Tri-State" because the remaining 24 members of the cooperative could then follow suit and sell. 805 F.2d at 355-56. Because of this "domino effect," Tri-State would have likely collapsed before the trial on the merits could be held. As the Tenth Circuit found that Tri-State had met its burden on this, as well as the other three factors, the appellate reversed the district court and entered an injunction to stop the sale until a trial on the merits could be held.

Plaintiffs also cite the Court to *Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011), to support their contention that the availability of money damages does not necessarily preclude the Court from finding irreparable injury. In *Janvey,* the United States Court for Appeals for the Fifth Circuit affirmed a district court's grant of preliminary injunctive relief to the receiver of the Stanford Estate. The Securities and Exchange Commission had brought suit against an investment company, Stanford and related entities, alleging that it had perpetrated a "massive Ponzi scheme," involving billions of dollars *Id.* at 589-90. The district court appointed Robert

11

Janvey ("Janvey") as a receiver "to marshal the Stanford estate." *Id.* At the time the lawsuit was filed, Stanford should have had assets in excess of $7 billion, but had less than $1 billion. *Id.* at 590. After his appointment, Janvey froze millions of dollars in assets, allegedly containing funds dispersed by Stanford to former employees. The district court set a date to thaw the frozen assets and to complete the review. Janvey filed a series of claims against "investor" relief defendants and "employee" relief defendants. He sought a preliminary injunction to freeze certain funds held by the former Stanford employees, which were the proceeds of the alleged Ponzi scheme, and for which he alleged claims of unjust enrichment and fraudulent transfer. *Id.* at 591. The receiver sought equitable relief to recover the property to hold in constructive trust for the benefit of the creditors. *Id.* at 600.

While the *Janvey* court recognized that "some courts have found that a remedy at law is inadequate if legal redress may be obtained only by pursuing a multiplicity of actions," in reaching its decision, the court also explained that speculation of injury is not sufficient to justify an injunction, and that there must be something more than "unfounded fear." *Id.* Further, it expressly recognized that the Stanford receiver did "not seek damages for breach of contract or tort." *Id.* Rather, the *Janvey* Court determined that the receiver had provided evidence to show that there was a Ponzi scheme, that such transfers are presumed fraudulent, and that each individual employee received proceeds. The Court further found that the dissipation of assets "that are the subject of this suit" would "impair" the district court's ability to grant an effective remedy." *Id.*

The facts of this case are far removed from *Janvey* and *Tri-State*. There is no pending criminal or regulatory investigation at issue, the Court has no basis to appoint a receiver, and there are no allegations that Plaintiffs will, themselves, become insolvent prior to trial. While

12

there are certainly strong allegations of misconduct on both sides, turning largely on credibility determinations, at its heart, this is breach of contract dispute between two former distributors and the company for which they distributed products. Plaintiffs do not seek equitable relief, but money damages in an amount which they have been able to calculate for the Court. Further, they have offered no more than their own speculative belief and fear that they would be unable collect a judgment from LIMU if they were to prevail at trial. There is no dispute that there has been a merger between LIMU and Ariix; indeed, such information is available on the LIMU website. However, Plaintiffs have nothing other than their speculative concern that such a merger will prevent them from collecting a money judgment. Such a fear is particularly speculative when the very person to whom they allege a disbursement has already been made and who will continue to receive disbursements over a "long" period of time, Raser, is also a party to this lawsuit. Finally, the Court notes that this is not a case expected to last many years. A jury trial is set for June 8, 2020, approximately eight months away. Plaintiffs have failed to meet their burden of establishing that irreparable harm, or any harm, is imminent, much less that irreparable harm will occur based on LIMU's merger with another MLM company before trial is held.[3] As Plaintiffs have failed to prove irreparable harm, their motion must be DENIED.[4]

Finally, given the Court's determination that Plaintiffs have failed to establish irreparable harm, the Court need not address Plaintiffs' evidentiary objections or Defendants' response.

---

[3]Plaintiffs may certainly pursue, at the appropriate time, any options available to them under Rule 64. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 330-31 (Rule 65 could not be used by general creditor seeking damages at law and with no lien on property to obtain prejudgment injunction because such a use of Rule 65 would render Rule 64 "a virtual irrelevance. Why go through the trouble of complying with local attachment and garnishment standards when this all-purpose pre-judgment injunction is available?"). The Court offers no opinion whether any such Rule 64 options **are** available at this time, only that Plaintiffs have failed to meet the standards for issuance of TRO or injunction under Rule 65.

[4]As Plaintiffs must establish all four factors to obtain injunctive relief, the Court need not reach the remaining three factors.

13

Plaintiffs may raise any evidentiary objections prior to trial either by listing those objections in the pre-trial order, filing motions in limine, or by any other method otherwise permitted by the Federal Rules of Civil Procedure and the orders of this Court.

### III. CONCLUSION

Plaintiffs have failed to establish irreparable harm. Monetary damages can be calculated in this case, and those damages provide an adequate judicial remedy. Raser, the alleged recipient of the proceeds from the LIMU-Ariix merger, remains a Defendant. Further, Plaintiffs will or do have at their disposal, pursuant Rule 64, all actions available under state law. Accordingly, Plaintiffs' motion for a TRO and Request for Emergency Relief under the TRO is DENIED. Plaintiffs' evidentiary objections are DENIED AS MOOT as they relate to the pending motion, subject to re-urging if appropriate, prior to or during trial.

MONROE, LOUISIANA, this 26th day of September, 2019.

_____
Terry A. Doughty
United States District Judge