# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

| | |
|---|---|
| OCEAN SKY INTERNATIONAL, L. L. C., ET AL. | CASE NO. 3:18-CV-00528 |
| VERSUS | JUDGE TERRY A. DOUGHTY |
| THE LIMU COMPANY, L.L.C., ET AL. | MAG. JUDGE KAYLA D. MCCLUSKY |

### REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion for sanctions pursuant to the court's inherent authority, and/or an alternative motion for sanctions for spoliation of evidence [doc. # 272] filed by Plaintiffs/Defendants-in-Counterclaim, Ocean Sky International, Inc. ("Ocean Sky") and Suni Enterprises, Inc. ("Suni"). The motion is opposed. As detailed below, it is recommended that the motion be GRANTED-IN-PART and DENIED-IN-PART.

### Background

Plaintiffs' motion seeks redress for the harm that Plaintiffs suffered as a result of Defendant, The LIMU Company, L.L.C.'s ("LIMU") extended refusal to produce an accurate and complete listing of Plaintiffs' downlines.[1] In response to recurrent protests by Plaintiffs and their damages expert, Derk Rasmussen, that Plaintiffs' downlines were incomplete, including the fact that the Rusty Barton leg of Ocean Sky's downline was missing, LIMU and their attorneys steadfastly denied that the discovery responses were insufficient. However, within two weeks after Magistrate Judge Hayes ordered LIMU to provide Ocean Sky with access to backup copies

---

[1] In the multi-level marketing ("MLM") industry, a "downline" refers to network members that a promoter has recruited to join the organization.

of the three databases that it used to provide Plaintiffs with its responses to the discovery requests, LIMU produced a new document to Plaintiffs that inexplicably included the missing leg(s) of Plaintiffs' downlines which, until that point, LIMU had maintained were not missing at all. The instant motion followed.

Because this motion is the culmination of at least two prior motions, the court will incorporate salient facts from the prior decision(s) on this same subject matter and supplement them, as needed.

1. On February 21, 2019, Ocean Sky propounded its First Set of Requests for Production of Documents to Defendant, LIMU, which sought, *inter alia*, the following pertinent documents:

   a) No. 54: "Any and all DOCUMENTS evidencing and/or relating to downline sales on a quarterly or annual basis by and/or among your top ten PROMOTERS for the past five (5) years."

   b) No. 55: "A copy of Ocean Sky International, Inc.'s entire downline on a quarterly or annual basis as it existed from the time it enrolled with you to present date."

   c) No. 56: "A copy of Suni Enterprises, Inc.'s entire downline genealogy on a quarterly or annual basis as it existed from the time it enrolled with you to present date."

   d) No. 59: "Any and all DOCUMENTS evidencing Ocean Sky International, Inc.'s personally enrolled downline as it existed on January 1, 2014 to present date."

   e) No. 60: "Any and all DOCUMENTS evidencing Suni Enterprises, Inc.'s personally enrolled downline as it existed on January 1, 2014 to present date."

   f) No. 64: "A copy of your entire genealogy reports evidencing rank for each active distributor for each month dating back for the past five (5) years." (M/Compel; Decl. of Chris Wellman, Exh. A).

2. On April 24, 2019, LIMU provided responses to the requests and interposed objections on the grounds that the discovery sought information that was not

2

proportional to Ocean Sky's claims or defenses.   (Wellman Decl.).   Following a meet and confer conference, however, LIMU agreed to produce the data, and did so on December 9, 2019.   *Id.*

3.       Upon receipt of the data, Ocean Sky forwarded the information to its damages expert, Derk Rasmussen, for verification that it was complete and accurate. (Wellman Decl.).   However, Mr. Rasmussen discovered that the data were both incomplete and manipulated, allegedly constructed in a manner to make it appear as if Ocean Sky's damages were less than claimed.   *Id*.

4.       Ocean Sky related to LIMU what Mr. Rasmussen had found.   (Wellman Decl.). In response, LIMU conceded that the information was incomplete, blaming it on a "technical glitch" within its system.   *Id*.   LIMU agreed to produce a secondary set of data, which it did on March 3, 2020.   *Id*.

5.       Upon receipt of the second set of data, Ocean Sky again forwarded the information to Mr. Rasmussen for review.   (Wellman Decl.).   However, Rasmussen confirmed that the information still was incomplete.   *Id*.   Ocean Sky communicated to LIMU the results of Mr. Rasmussen's latest findings.   *Id*.

6.       Some highlights of Mr. Rasmussen's findings include the following:

Defendants originally produced seven XSLX or CSV files with bates numbers LIMU_002721 to LIMU_002727 relating to distributors within LIMU's organization and sales generated by each distributor.   Defendant has not clearly indicated how the files produced provide a specific answer to each of Plaintiff's requests for production of documents.

*             *             *

I traced the enroller and sponsor for all 101,131 distributors included in LIMU_002727 to determine the distributor(s) at the top of the downline and the level of each distributor.   Through my analysis I determined that distributor 1015501, Ocean Sky, is the top distributor for this list and that all 101,131 distributors fall within Ocean Sky's organization.   I compared the distributors within LIMU_002727 to a list of top distributors I received from Plaintiffs which I understand were members of Ocean Sky's downline.   I found that not all distributors were found in LIMU_002727.   For example, distributor 1001401, and all sublevel distributor below 1001401 are missing from LIMU_002727.   **It is my understanding that 1001401's downline was positioned as Ocean Sky's second leg and may include more than 40,000 distributors.**
(Rasmussen Decl.; M/Compel, Exh. [doc. # 185-7]) (emphasis added).

3

7.    In a February 12, 2020 email, Plaintiffs' counsel wrote to defense counsel and stated that,

"[m]y expert has confirmed that the data you produced only show the downline information post suspension.  In other words, the documents show that my clients' downlines have been completely dismantled and transferred to third parties, including Brent Palmer. This is insufficient for purposes of our damages calculation.

Please produce the downline data as it existed **pre-suspension** (i.e., prior to November 2017).  I ask that this data be produced no later than **February 21, 2020**, since they have been outstanding for many months now."
(Feb. 12, 2020 email from C. Wellman to M. Soles; Opp. Memo., Exh. C [doc. # 202-5]).

Defense counsel, Ms. Soles, replied,

**"[w]e confirmed with our client that the data produced shows the downline information as it existed prior to your clients' suspension in December 2017.  I am not sure the source of your expert's confusion or the basis for your statements**. If you would like to provide more information, we are available to discuss."
(Feb. 17, 2020 email from M. Soles to C. Wellman; Opp. Memo., Exh. C [doc. # 202-5] (emphasis added)).

On February 24, 2020 Plaintiffs' counsel emailed Ms. Soles with a list of six sample discrepancies in the data produced by LIMU, including the following,

"[t]he downline of Ocean Sky is missing many significant distributors that would account for a large part of Ocean Sky's commissions.  **For example, distributor 1001401 for Rusty Barton, and all sublevel distributor[s] within Mr. Barton's downline are missing from LIMU_002727**."

He concluded,

**"[i]t seems that the data was manipulated so as to make my clients' damages calculation smaller**.  At this point, we cannot rely on the information produced by your client and now are

4

demanding that we be afforded an opportunity to have access to the database so my experts can extract the information ourselves . . ."
(Feb. 24, 2020 email from C. Wellman to M. Soles; Opp. Memo., Exh. C [doc. # 202-5]) (emphasis added).

Ms. Soles replied to Mr. Wellman on March 2, 2020:

**"[y]ou identified several other alleged discrepancies but upon review, it appears you or your expert are misreading the data. There is no inconsistency between the reports and no data is missing or been manipulated.** The prudent course is for you to ask all questions of LIMU's corporate representative at the appropriate deposition."
(March 2, 2020 email from M. Soles to C. Wellman; Opp. Memo., Exh. C [doc. # 202-5]) (emphasis added).

8. Counsel for Ocean Sky met and conferred with his opposite number(s) regarding the incomplete data. In an effort to resolve the issue, Ocean Sky offered LIMU two options: 1) that Ocean Sky's expert be permitted access to the native data in order to extract the information himself with the understanding that such access would be monitored by all parties and conducted via screen share; or 2) that Ocean Sky's expert be allowed to meet and confer with LIMU's IT person to resolve the issue of whether the data was incomplete. (Wellman Decl.).

9. Counsel for LIMU informed Ocean Sky's attorney that LIMU would not make its employee available for an informal discussion with Plaintiff's expert, but would make the employee available for a deposition. (Decl. of George Snellings; Opp. Memo., Exh.).

Concerned about the cost associated with taking a formal deposition, Ocean Sky filed a

motion to compel on July 23, 2020, and requested entry of the following order against LIMU:

[that] Ocean Sky's expert be permitted access to the native data in order to extract the information himself with the understanding that such access would be monitored by all parties and conducted via screen share; *or* that Ocean Sky's expert be allowed to meet and confer with LIMU's IT person to resolve the issue of whether the data was incomplete.

On August 13, 2020, LIMU filed its opposition to the motion to compel, in which it

argued that there was nothing within Rule 26 of the Federal Rules of Civil Procedure that

5

required it to make its employees available to an adversary's expert for an informal discussion to address alleged discrepancies associated with the employer's document production.   [doc. # 202].   As for Ocean Sky's alternative request for access to LIMU's native files, LIMU asserted that Ocean Sky had not met its burden to show that native file access was appropriate or necessary because there was no evidence that LIMU had failed to honor its discovery obligations.

Ocean Sky filed its reply brief on August 14, 2020.   [doc. # 203].   It asserted that the data produced by LIMU remained incomplete and not in compliance with Rule 34(b)(2)(E) of the Federal Rules of Civil Procedure.   Ocean Sky emphasized that while its expert had explained why the data produced by LIMU remained incomplete, LIMU had failed to adduce any evidence to refute those findings.   Consequently, Ocean Sky asked the court to enter an order requiring LIMU to grant it access to the native data so Ocean Sky could extract the information itself.

In her ruling on the motion to compel, Magistrate Judge Hayes stated, *inter alia*, that,

> **as Ocean Sky noted, LIMU failed to rebut the discrepancies in the data that Ocean Sky's expert identified in his declaration**.   As such, and given LIMU's past intransigence in discovery matters, the court is not persuaded that permitting Ocean Sky to take the deposition of LIMU's IT professional will resolve Mr. Rasmussen's concerns.   Instead, it is highly likely that, after taking the deposition, Ocean Sky would be forced to return to the court to obtain an order requiring LIMU to make the data available in its native format.

(Aug. 21, 2020, Memo. Order [doc. # 205]) (emphasis added).

Accordingly, the court ordered LIMU to "permit Ocean Sky's expert to access the native data sought in the discovery requests so that he may extract the requested information himself, with

6

the understanding that such access will be monitored by all parties and conducted via screen share." *Id*.

Unfortunately, the data extraction process did not go as seamlessly as envisioned. Amongst other issues, even though the court ordered LIMU to provide access to the native data, LIMU restricted Ocean Sky from viewing the names of the distributors listed.   Ocean Sky, however, did not agree to this restriction during the parties' discussions prior to the extraction process.   In fact, Ocean Sky made it clear that the distributor names had to be provided during the extraction.   Ocean Sky's experts reviewed the data and after doing so, they found numerous inconsistencies.   For instance, when comparing both the original data produced by LIMU to the new data that was extracted, Ocean Sky's experts concluded that information in the original data was inconsistent or altogether missing from the new data.   According to Ocean Sky, this was a direct result of LIMU's refusal to permit access to the relevant databases and to allow Ocean Sky to extract the data in its native form.   (Rasmussen Decl.; Wellman Decl.).

On September 29, 2020, Ocean Sky filed a motion for contempt against LIMU for its alleged failure to comply with the court's August 21, 2020 order requiring it to permit Ocean Sky's expert to access the native data sought in the discovery requests so that he might extract the requested information himself.

LIMU filed its opposition to plaintiff's motion on October 21, 2020, together with supporting declarations from two of its attorneys, Maureen Soles and Alec MacInnes, plus one from its former Senior Director of Information Technology, Rich Dadisman.   (LIMU Opp. Brief and Exhs. [doc. # 223].   LIMU characterized the dispute as nothing more than a "fabrication," and instead emphasized, that LIMU had gone above and beyond the requirements of the court

order in an attempt to accommodate Ocean Sky's inquiries.   Consequently, LIMU asked the court not only to deny Ocean Sky's motion, but also to award it attorney's fees that it incurred to respond to the motion.

> LIMU further stated that,
>
> Plaintiff also claims this Court should find LIMU acted in bad faith by withholding data relevant to damages. But LIMU has never withheld any data.   Plaintiff suggests the data originally produced by LIMU was manipulated. LIMU, however, maintains the accuracy of the data. LIMU is confident that once the Court is presented with the evidence regarding the data, it will accept the veracity of the data originally produced.   **To the extent Plaintiff claims the data its expert extracted from LIMU's database was incomplete or manipulated, Plaintiff's expert failed its client**.

(LIMU Opp. Brief, pg. 11 [doc. # 223]) (emphasis added).

To reconcile the parties' divergent positions on the contempt motion, Magistrate Judge Hayes held an almost three-hour long hearing on November 16, 2020, wherein the court received testimony pertaining to LIMU's database production.   *See* Minutes [doc. # 240] and Transcript of Hearing [doc. # 260] (hereinafter, "Tr.").   The following excerpts are pertinent to the present motion,

> MS. SOLES:   Could you explain to the Court how long the database LIMU was in existence and how that differed from LIMU Reporting.
>
> MR. DADISMAN:   The LIMU database started in production and taking new orders and processing of data starting in October 2016 after we migrated to a new platform that had been custom developed.   So the prior platform that we used was running from beginning at 2013 until 2017 because both systems were running tandem for a short period for time.   But the LIMU database, because it was essentially an upgrade, all of the customer history and order history were preserved . . .

(Tr. 47-48).

*          *          *

MS. SOLES:   Sir, on September 18th, you also gave – plaintiffs' expert was allowed access to the database LIMU_5_1_2018.   Correct?

MR. DADISMAN:   Correct.

MS. SOLES:   And could you explain to the Court what that database reflects.

MR. DADISMAN:   So that database looked on -- the structure is the same as the LIMU database because that is a copy of the LIMU database that was taken on May 1st of 2018, and so has a snapshot of the business and the downlines as they existed on 5/1/2018.

MS. SOLES:   And so 5/1/2018 for short, that is just a snapshot of the larger database LIMU that they were -- that plaintiffs' expert was also given access to?

MR. DADISMAN:   Correct.

MS. SOLES:   And why did you provide access to the LIMU_5_1_2018 database?

MR. DADISMAN:   **Because that database had the sponsoring information and downline information for the Pardues still intact**.
(Tr. 50-51) (emphasis added).

                    *          *          *

MS. SOLES:    Mr. Dadisman, I think you were just speaking about the -- what the database, LIMU_5_1_2018 was and why you -- why access was granted to that.

MR. DADISMAN:   Yes, because that was a snap -- snapshot in time of the entire business as of 5/1/2018.   And that backup was made for the purposes of having a known copy of the database as of that date prior to having made significant changes into the sponsorship tree. So that was a known good copy of all the data.   And then we could test making changes to the organization of the tree and see how that would then impact the overall structure.

MS. SOLES:   And within that database, does that represent the entire LIMU organization?

MR. DADISMAN:   Yes, as it existed on that date.

MS. SOLES:   It was not limited to just the plaintiffs in their former downline?

9

MR. DADISMAN:   Correct.

(Tr. 51-52).

Following the hearing, Magistrate Judge Hayes issued an order that granted-in-part and denied-in-part Plaintiffs' motion for contempt.   (Nov. 20, 2020, Mem. Order [doc. # 253]).   As relevant here, the order required "LIMU to provide Ocean Sky's expert with access to backup copies of the three databases from which it represented that it generated its responses to the subject discovery requests:   Limu, Limu_5_2018, and LimuReporting."   *Id*.   The court also required LIMU to include the promoter/distributor names with the data and the SQL statements that it used to produce the responsive information.   *Id*.

On December 2, 2020, LIMU produced to Plaintiffs: (1) the three backups of the databases identified in the court's order; (2) the SQLs to create the spreadsheets previously produced in discovery; and (3) a new report, LIMU_13784, that listed Ocean Sky's downline including the Barton downline and the SQL to create the spreadsheet.   According to LIMU, the new report, LIMU_13784, corrected the error in LIMU_002727.   However, LIMU did not explain the circumstances of how or when it finally discerned that LIMU_002727 had been incorrect.   Until this point, LIMU consistently had represented to Plaintiffs, and to the court, that any errors perceived by Plaintiffs' expert in the data produced by LIMU stemmed from the expert's own error or ignorance.

Plaintiffs posit that

[t]he only reasonable explanation for why this information was being produced at this late juncture was because, now that Mr. Rasmussen would soon be able to review the databases fully unrestricted, he would discover that the +40,000 distributors were deliberately removed from Ocean Sky's downline to manipulate damages. In other words, LIMU was attempting to beat Mr. Rasmussen to the punch to detract from its improper conduct of purposefully removing information from the databases prior to the production process.

(M/Sanctions, Memo., pg. 8 [doc. # 272-1]).

On December 23, 2020, Plaintiffs, Ocean Sky and Suni, filed the instant motion for sanctions against LIMU pursuant to the court's inherent authority, and/or for spoliation of evidence.   In support of their motion, Plaintiffs submitted the declaration of their damages expert, Derk Rasmussen, who reviewed the databases and new report(s) provided by LIMU. Relying on Mr. Rasmussen's declaration, as well as the progression of discovery in this case, Plaintiffs set forth the following "facts" to support their motion:

a. First, while LIMU continuously represented under oath that it produced "all" the data responsive to Ocean Sky's discovery and that nothing was "withheld," such representations were false. LIMU withheld reports with more than 40,000 distributors added back into Ocean Sky's organization. This data was withheld and never produced in the first production, the second production, and during the extraction process.

b. Second, LIMU's representation that it "preserved" Ocean Sky's downline before any changes were made to it is false. It has been verified through the unrestricted databases that, while LIMU made a backup of Ocean Sky's downline on May 1, 2018 to allegedly preserve it, it deliberately removed more than 40,000 distributors from the downline five (5) days beforehand on April 25, 2018 at 2:55 p.m. It is also confirmed that the removal of these +40,000 distributors was carried out by LIMU's own IT consultant, Mr. Dadisman, who testified under oath to this Court that Ocean Sky's downline was fully preserved "prior to having made significant changes" to it. Undeniably, during his sworn testimony, Mr. Dadisman concealed the fact that +40,000 distributors were removed from Ocean Sky's downline before the backup was created.

c. Third, LIMU's representation that it provided "all" information responsive to Ocean Sky's discovery requests during the extraction process was false. In fact, as explained above, there were reports evidencing that over 40,000 distributors were put back into Ocean Sky's downline that were never included in the first production, the second production, and the extraction process. Moreover, the tracking data showing when these distributors were intentionally removed from Ocean Sky's downline was never provided in this entire discovery process until just now.

d. Fourth, because these +40,000 distributors were intentionally removed from Ocean Sky's downline, and because LIMU did not preserve the downline pre-removal, it is impossible to recreate the downline as it existed at the time Ocean Sky was

11

terminated. Even though LIMU has attempted to put these distributors back into Ocean Sky's downline, the corresponding data has been corrupted and/or is entirely missing. In other words, due to LIMU's nefarious actions of altering the data and then trying to fix it after being caught, the evidence Mr. Rasmussen would have needed to support his damage model, which is based on actual transactions after the wrongful termination, has now been destroyed (i.e. spoiled). As a result, Mr. Rasmussen is therefore restricted from relying on granular-level post termination data to support his preferred damage model which has unduly prejudiced the Plaintiffs.

e. <u>And finally</u>, because LIMU's conduct was kept hidden from Plaintiffs and the Court for many months, and would have remained undetected but for Ocean Sky's efforts, it has been confirmed that LIMU intentionally, and in bad faith, tampered with evidence to manufacture a false damage figure.

(M/Sanctions, Memo., pgs. 12-14).

Plaintiffs contend that LIMU's actions as detailed above, which also included making false statements under oath/perjury, warrant terminating sanctions consisting of:   1) entry of default against LIMU on all claims asserted by Ocean Sky and Suni; 2) the striking of all counterclaims and defenses asserted by LIMU; and 3) reimbursement of $17,728.50 in attorney's fees and costs incurred by Plaintiffs in prosecuting this motion.   Alternatively, Plaintiffs requested evidentiary sanctions against LIMU that would prohibit LIMU from disputing Plaintiffs' damages claims and preclude LIMU from advancing any claim for damages on its own affirmative claims because it was premised upon incomplete, missing, or altered claims. Under this latter model, Plaintiffs also requested reimbursement of its attorney's fees and costs in the amount of $17,728.50.

LIMU filed its opposition to Plaintiffs' motion for sanctions on February 2, 2021.   [doc. # 299].   In its response, LIMU downplayed the significance of its repeated discovery denials and misrepresentations, and instead emphasized that Plaintiffs' expert *now* has full backups of

LIMU's databases and the SQLs used to generate the discovery responses.   LIMU submitted a declaration from its own expert, Ted Tatos, who opined that,

1.    Data was not corrupted by movement of the Barton downline;

2.    A complete list of customers and promoters downline to Ocean Sky before its termination was provided to Plaintiffs on December 2, 2020 and confirmed to be accurate;

3.    No data is missing or has been deleted from the databases;

4.    Nothing prevents Mr. Rasmussen from performing his "preferred" damage model from the data;

5.    Even if Mr. Rasmussen's "preferred" damage model cannot be performed—it most certainly can—there are and were other methods or models available based on the data Plaintiffs and Mr. Rasmussen had since March of 2020;

6.    Plaintiffs have not established any intent; and

7.    There is no actual prejudice to justify further sanctions in this case.

(LIMU Opp. Memo., pgs. 1-2 [doc. # 299]).

LIMU explained that the reason Rusty Barton's downline was missing from LIMU_002727 in February 2020 was because Barton had left LIMU in 2016, and LIMU believed that the Barton downline had been moved out of the Ocean Sky downline at the time of Barton's departure.   LIMU maintained that it did not intentionally try to hide downline volume from Ocean Sky, especially since data relating to Ocean Sky's organizational volume, which included the Barton downline, had been correctly disclosed to Plaintiffs.

LIMU emphasized that,

by retaining Barton's ID number, Plaintiffs were able to gather the organizational volume for the entire leg from the previously produced documents such as LIMU_009208 because that ID number reflected the organizational volume for the entire organization of +40,000 promoters that Plaintiffs now contend were

13

>concealed from them. From March 2020, Plaintiffs possessed and were able to identify volume associated with this organization from the documents already produced by LIMU.

(LIMU Opp. Memo., pg. 6).

LIMU characterized Plaintiffs' claim of spoliation as a mere "litigation tactic," and asserted that Plaintiffs' allegation of perjury was "misplaced." LIMU stated that "[t]he motion for contempt and hearing on November 16, 2020 demonstrated the spreadsheet produced to reflect the Ocean Sky Downline was inadvertently missing the Barton Downline." (LIMU Opp. Memo., pg. 8). LIMU, however, did not explain how it arrived at this epiphany. To the contrary, throughout its defense of the motion to compel, the motion for contempt, and at the hearing, LIMU maintained that Plaintiffs were mistaken and that LIMU had fulfilled its discovery obligations regarding Plaintiffs' downline.

LIMU further noted that there was no evidence that Suni's data was destroyed or affected in any way because the Barton downline was distinct from Suni's downline. LIMU also cited the fact that it did not manipulate Suni's downline as a basis to undermine any inference that it acted in bad faith. LIMU reasoned that if it had intended to deflate Plaintiffs' damages, then it logically would have taken steps to affect Suni's data also.

LIMU further disputed Plaintiffs' contention that it had committed perjury. LIMU discussed five instances of alleged perjury by its former employee, and current consultant, Rich Dadisman, but contested the falsity of any of his statements made at the November hearing on the motion for contempt. LIMU characterized any misleading statements by Dadisman as "unfortunate," or attributed them to a misunderstanding.

Finally, LIMU urged the court not to award any costs. LIMU suggested that Plaintiffs'

counsel could have avoided the instant motion if he had been willing to confer and to identify the issues.   LIMU argued that Mr. Rasmussen's claim for 55.93 hours spend on his declaration was unreasonable and likely included "meetings with LIMU's counsel to explain LIMU's data to Plaintiffs."  (LIMU Opp. Memo., pg. 25).

Although Plaintiffs' motion for sanctions was not directed at him, Defendant, Gary Raser, opted to file an opposition to the motion on February 2, 2021.   (Raser Opp. Memo. [doc. # 298]).   Raser argued that sanctions were not warranted against him or LIMU.   Quoting the Advisory Committee Note to the 2015 amendment to Rule 37(e), Raser observed that Rule 37(e) "authorizes and specifies measures a court may employ if information that should have been preserved is lost, and specifies the findings necessary to justify these measures.   It therefore forecloses reliance on inherent authority or state law to determine when certain measures should be used."  *See* FED. R. CIV. P. 37, Advisory Committee Note, 2015.

When LIMU's alleged misconduct was properly cabined to, and analyzed under Rule 37(e), Raser asserted that there was no lost electronically stored information ("ESI") at all, and that "any alleged inconvenience to Plaintiffs resulting from LIMU's preservation and production of LIMU_002727 (the incomplete Ocean Sky organization) was rectified prior to Plaintiffs' motion for sanctions."  (Raser Opp. Memo., pg. 4).   Raser argued that even if Plaintiffs were able to show that any ESI had been lost, with resulting prejudice, Rule 37 limited the court to measures no greater than necessary to cure the prejudice.   FED. R. CIV. P. 37(e)(1).   Raser emphasized that, aside from "innuendo and bald assumptions," Plaintiffs were unable to show that LIMU intentionally tried to deprive Plaintiffs of the use of the ESI in this litigation.

Accordingly, the more stringent remedies authorized under Rule 37(e)(2), remained unavailable. Raser stressed that LIMU reorganized the Barton downline in the ordinary course of its business as an MLM company.

On February 9, 2021, Plaintiffs filed a reply brief wherein they asserted, *inter alia*, that relief should be accorded to Suni (as well as Ocean Sky) because Suni was in Ocean Sky's downline, and therefore, any manipulation of Ocean Sky's downline also affected Suni.   (Pl. Reply Brief [doc. # 306]).   Plaintiffs decried the fact that LIMU had not produced a "movement log," documenting the movement of distributors, until after Plaintiffs had prevailed on their contempt motion.   Plaintiffs further proclaimed that LIMU's contumacious conduct, i.e., its inability to tell the truth, had infected the entire case.   *Id*., pgs. 9-10.

Plaintiffs adduced evidence that they had discovered that another LIMU distributor, Brent Palmer, had provided an affidavit against the Pardues, which LIMU relied on to terminate Ocean Sky's distributorship.   (Decl. of C. Wellman; Pl. Reply Brief, Exh. [doc. # 306-1]).   To confirm Plaintiffs' suspicion that Palmer had provided the affidavit in exchange for consideration, Plaintiffs had propounded the following discovery request to LIMU in 2019:   "[a]ny and all DOCUMENTS evidencing who ACQUIRED Ocean Sky International, Inc.'s downline, and when it was ACQUIRED by that person/entity."   *Id*.; Pl. 1st Set of Requests for Production of Documents, No. 25, dated 21 February 2019; Pl. Reply Brief, Exh. [doc. # 306-3].   The term "ACQUIRED" was defined as "any and all downlines that [LIMU]:   1) transferred to another promoter; or 2) which [LIMU] sold to another promoter; or 3) which was automatically rolled up to another promoter."   *Id*.

16

On June 17, 2019, after imposing various spurious objections to Plaintiffs' discovery request, LIMU ultimately responded that "no one 'acquired' 'Ocean Sky International's downline.'"   (LIMU's Ans. to Reqs. for Prod. of Documents; Pl. Reply Brief, Exh. [doc. # 306-4]).   However, in his February 2, 2021 declaration, Rich Dadisman admitted that in April 2018, he "was asked to move Rusty Barton and the Barton Downline from the former Ocean Sky organization to the organization under Brent Palmer."   (Decl. of Rich Dadisman; LIMU Opp. Memo, Exh. [doc. # 300-5]).

To support their request for terminating sanctions against LIMU, Plaintiffs listed Defendants' history of unfair litigation tactics in this case, including,

1) LIMU altered testimonials on its website by removing product and income claims. When Plaintiffs requested the original testimonials in discovery, LIMU indicated that none existed. (Dkt. No. 65-1, ¶3). However, such testimonials did exist.

2) LIMU represented that it did not keep testimonials submitted for corporate events because they were thrown out. However, it turned out the testimonials were actually emailed to LIMU's Gmail portal and were stored there. Again, LIMU's representation was false. (Dkt. No. 79-1, ¶¶10-14).

3) When Plaintiffs suspected LIMU sold its downline to Ariix, LIMU represented that it was unaware of a "transaction that would impact this litigation." (Dkt. No. 67-1, ¶10). Obviously, this statement was false because LIMU is now a mere shell with no assets and has less than $50,000 left in its bank account. (Dkt. No. 228-1).

4) Raser committed witness tampering by sending threatening text messages to Plaintiffs' witnesses. And when Raser was confronted about this, he disingenuously blamed his behavior on wrongful solicitation, even though the evidence undermined his testimony. (Dkt. No. 206-1, ¶16-18).

5) When Plaintiffs requested the Asset Purchase Agreement for the Ariix transaction, LIMU produced a nearly all-redacted document. LIMU obviously knew the document was relevant, yet it disingenuously represented that it contained "proprietary" information that could not be disclosed. (Dkt. No. 111-1, ¶18). The Court found no evidence of this. (Dkt. No. 119, pg. 12; see also Dkt. No. 119, pgs. 3-4).

6) And finally, LIMU manipulated Ocean Sky's downline data and then made continuous false statements about their manipulation of the data to the Court and to Plaintiffs' for almost an entire year. This is the subject of this current motion for sanctions.

(Pl. Reply Brief, pgs. 14-15).

On February 22, 2021, LIMU filed an amended sur-reply to address what it asserted were misleading and false statements set forth in Plaintiffs' reply brief.   (LIMU Sur-Reply [doc. # 319]).[2]   LIMU argued that Plaintiffs had absolutely no factual support for their assertion that the LIMU_5_2018 database excluded the Barton downline.   *Id*., pg. 2.   Instead, LIMU stated that all data related to the Barton downline may be found within the *three* databases produced to Plaintiffs.   *Id*.   LIMU stressed that no data was excluded from those databases.   *Id*.

LIMU also urged the court to disregard Plaintiffs' argument regarding LIMU's failure to produce the "movement log," because Plaintiffs improperly raised it in their reply brief.   LIMU added that Plaintiffs never requested the movement logs from LIMU's database during discovery.   LIMU went on:   "[p]resumably, Plaintiffs did not request the log because Plaintiffs already knew Barton had been moved under an active promoter . . . In any event, not producing something that was not requested does not evidence bad faith or willful abuse of judicial process."   *Id*., pg. 4.

In a curious attempt to excuse the errors in the data that it had produced previously, and which it, heretofore, steadfastly had represented were correct, LIMU asserted that Plaintiffs

---

[2]  Plaintiffs filed an opposition to LIMU's request for leave to file the amended sur-reply, which essentially amounted to a sur-sur-reply that addressed each of LIMU's arguments in its proposed brief.   (Pl. Opp. [doc. # 316]).

knew or should have known of the error all along:

> [m]ore importantly, Plaintiffs' misrepresentations obscure the fact that LIMU accurately reported its entire network of promoters and customers in December 2019 when it produced LIMU_2722. This document disclosed that Rusty Barton, ID number 1001401, was then sponsored by a promoter ID number other than Ocean Sky.  Because Ocean Sky obviously knew this promotor ID number was not associated with its account, Ocean Sky knew, or at least should have known, that Rusty Barton had been moved to another promoter.  *See* Doc. No. 300-6.  As LIMU demonstrated in its Response in Opposition to the Motion for Sanctions, *see* Doc. No. 300- 3 at p.8-13, 14-18, the December 2019 produced document (LIMU_ 2722) accurately disclosed LIMU's downline and showed Mr. Barton was then sponsored by another promoter.  There was no concealment of Barton's +40,000 downline.

(LIMU Amend. Sur-reply, pg. 4 [doc. # 319]).

Briefing is complete; the matter is ripe.

## <u>Analysis</u>

Defendant, Raser, and presumably by extension, LIMU, contends that the court cannot rely on its inherent authority to impose sanctions when electronically stored information ("ESI") that should have been preserved is lost.   Indeed, the Supreme Court has cautioned that, "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power." *Chambers v. NASCO, Inc.*, 501 U.S. 32; 111 S.Ct. 2123, 2136 (1991).   However, "if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power."   *Id*.

Plaintiffs' motion focuses upon LIMU's alleged failure to preserve Plaintiffs' downline for purposes of damages calculations, as well as LIMU's subsequent failure to disclose its actions to the court.   It is manifest that the alleged loss of ESI is directly contemplated by Rule

19

37(e) and should be addressed within the parameters of that rule.   Accordingly, the court will begin its discussion with Rule 37(e).

## I.    **Rule 37(e)**

a)    <u>Law</u>

Rule 37 provides that

[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

**(1)** upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

**(2)** only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

**(A)** presume that the lost information was unfavorable to the party;

**(B)** instruct the jury that it may or must presume the information was unfavorable to the party; or

**(C)** dismiss the action or enter a default judgment.

FED. R. CIV. P. 37(e).

In other words, four predicate elements must be established before a party may obtain relief under Rule 37(e):   1) the existence (at least at one time) of ESI that should have been preserved;[3]  2) the ESI has been lost; 3) the ESI was lost because of a party's failure to take

---

[3] A party's duty to preserve evidence arises when "the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."   *Toth v. Calcasieu Parish*, Civ. Action No. 06-0998, 2009 WL 528245 (W.D. La. Mar. 2, 2009) (Trimble, J.) (citation and internal quotation marks omitted); *Dixon v. Greyhound Lines, Inc.*, Civ Action No. 13-0179, 2014 WL 6087226, at *3 (M.D. La. Nov. 13, 2014).   A person "anticipat[ing] being a party . . . to a lawsuit must not destroy unique, relevant

reasonable steps to preserve it; and 4) the ESI cannot be restored or replaced.  *Richard v. Inland Dredging Co., LLC*, Civ. Action No. 15-0654, 2016 WL 5477750, at *3–4 (W.D. La. Sept. 29, 2016); *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, Civ. Action No. 17-365, 2019 WL 4738915, at *1 (W.D. Tex. Sept. 27, 2019).   Only once the court determines that the foregoing elements have been established may it then consider imposition of the appropriate responsive measure.  *Richard, supra*.

If a party has been prejudiced by the loss of the ESI, the court "*may* order measures no greater than necessary to cure the prejudice . . ."  FED. R. CIV. P. 37(e)(1).   If, on the other hand, the court finds that the party who lost the ESI "acted with the intent to deprive another party of the information's use in the litigation," then the court *may* choose to impose one of three, more severe, sanctions.  FED. R. CIV. P. 37(e)(2).

    b)    <u>Discussion</u>

As early as January 11, 2018, Plaintiffs' counsel transmitted written demands to LIMU, via counsel, explaining that Plaintiffs were contemplating legal action against LIMU if Plaintiffs' distributorships and past due commissions were not restored.   (Jan. 11, 2018, Letters; M/Sanctions, Exh. B to C. Wellman Decl. [doc. # 275]).   Unmoved by the letter(s), LIMU proceeded to formally terminate Plaintiffs' distributorship positions on March 12, 2018. (Compl., ¶ 42 [doc. # 1]).   Certainly, by that date, LIMU should have known that Plaintiffs'

---

evidence that might be useful to an adversary."  *Toth, supra*.   The duty to preserve extends to evidence that a party "knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request."  *Id*.

commissions from their downline were relevant in the event that they were reinstated to their positions.[4]

On April 19, 2018, Plaintiffs filed the instant lawsuit against Gary Raser and LIMU, and served Raser, via his wife, at a business address on April 25, 2018, at 2:35 p.m.   (Return of Service [doc. # 14]).[5]   Less than thirty minutes later, Rich Dadisman, at the request of an undisclosed individual, moved the Rusty Barton leg out of Ocean Sky's downline and placed it in Brent Palmer's downline.   (Decl. of D. Rasmussen; M/Sanctions, Exh. [doc. # 275-1]; R. Dadisman Decl.; LIMU Opp. Brief, Exh. [doc. # 300-5]).   Furthermore, Plaintiffs' expert, Mr. Rasmussen, noted 108 other instances where distributors were moved to another downline between the time that Ocean Sky was suspended (i.e., November 2017), and May 1, 2018. (Decl. of D. Rasmussen; M/Sanctions, Exh. [doc. # 275-1]).

According to LIMU's expert, Ted Tatos, no data was deleted and a full list of Ocean Sky's downline was produced to Plaintiffs on December 2, 2020, via the report entitled

---

[4] LIMU's Policies and Procedures manual provides that,
> [i]f a Promoter's termination is determined to be wrongful following final arbitration proceedings, the Promoter shall be reinstated as a Company Promoter in his/her original position and shall be paid those commissions that were withheld during the period of termination.   This shall be Promoters' sole and exclusive remedy for wrongful termination.

(LIMU Policies and Procedures, ¶ 8(c)(iii); M/Dismiss, Exh. C [doc. # 25-5]).

[5] Plaintiffs also attempted to serve Defendant, LIMU, on April 25, 2018, at 3:00 p.m., at the same address as Raser, but the entire staff was in a meeting, and there was no one available who was authorized to accept service.   (Return of Service [doc. # 15]).   Accordingly, Plaintiffs did not formally serve LIMU until the following day, April 26, 2018.   *Id.*

LIMU_13784.    (Tatos Decl.; LIMU Opp. Brief; Exh. [doc. # 300-4]).    Mr. Tatos further opined that Plaintiffs could use the LIMU_13784 file to verify Ocean Sky's pre-termination monthly organizational volume.    *Id*.    Moreover, Plaintiffs may aggregate the post-termination order volumes of members in the former Ocean Sky organization to calculate Ocean Sky's organizational volume after March 2018.    *Id*.    Tatos managed to compare personal volumes for the individuals in the Ocean Sky downline as identified in the LIMU_13784 file with the total organizational volume reported for Ocean Sky prior to any moves and found an average difference of only 0.05%.    *Id*.

On the other hand, Plaintiffs' expert, Mr. Rasmussen, maintained that LIMU should have preserved the following data:

1) A complete and accurate list of all members of the downline,

2) A complete and accurate list of any promoters/customers joining the downline since the termination, and

3) Calculations of commissioners withheld based upon the continuance and growth of the downline organization as maintained in the regular course of business.

(D. Rasmussen Reply Decl.; Pl. Reply [doc. # 309]).

He added that if,

Ocean Sky's downline data had not been altered prior to creating a properly preserved backup, it could have been possible to recreate historical volume numbers with exact precision . . . by not maintaining a complete Ocean Sky downline, any projection of future commissions becomes problematic.   This is because if you don't keep the downline intact, you are forced to recreate the commissions that would have been paid had the downline remained intact.   This is a very complicated and potentially overwhelming task.

*Id*.

On the present record, the court is unable to conclude that the movement of a significant

portion of Plaintiffs' downline either before or after the May 1, 2018, backup has caused the irretrievable loss of ESI.   While the movement of the downline may have complicated Plaintiffs' damages calculations, the precise extent of any prejudice remains indeterminate.   At the bench trial to be held in this matter, the court may make any necessary allowances or effect other curative measures if Plaintiffs establish that they were materially prejudiced by LIMU's failure to preserve ESI.

## II.    Inherent Authority

The second aspect of Plaintiffs' motion centers upon LIMU's failure to disclose that it had moved a significant leg of Plaintiffs' downline to another promoter before making a backup of Plaintiffs' downline on May 1, 2018.   In fact, LIMU made certain representations to Plaintiffs and to the court that were incorrect.   Neither side contends that this particular conduct is directly contemplated by rule or statute.   Accordingly, the court will analyze LIMU's actions and any resulting sanctions pursuant to the court's inherent authority.

### a)  Law

As Magistrate Judge Hayes observed previously, "[f]ederal courts have inherent powers necessary to achieve the orderly and expeditious disposition of their dockets."   *Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir.1996) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123 (1991)).   Thus, "[c]ourts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates."   *Chambers, supra* (citations omitted).   Because of their potency, however, "inherent powers must be exercised

24

with restraint and discretion." *Id*.  (citation omitted).   Assessment of attorney's fees as a sanction for bad faith conduct lies within a court's inherent power.  *Id*.   However, a court must exercise caution before invoking its inherent power and must comply with due process in finding bad faith and in assessing fees.  *Id*.

To utilize its inherent authority, the court first must find by clear and convincing evidence that the party engaged in "bad faith or willful abuse of the judicial process."  *In re Moore*, 739 F.3d 724, 729 (5th Cir. 2014).[6]   Bad faith "is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will."  *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999) (citing *inter alia*, Black's Law Dictionary 139 (6th ed.1990)).   Moreover, "[w]hen parties exploit the judicial process, through its inherent powers, a court may sanction conduct beyond the reach of other rules."  *Johnson v. Hankook Tire Am. Corp.*, 449 Fed. App'x. 329, 332 (5th Cir. 2011) (citation omitted).

Furthermore, the Supreme Court has recognized that,

a  court  may  assess  attorney's  fees  when  a  party  has  acted  in  bad  faith,

---

[6] In the related context of attorney discipline, the Fifth Circuit employs the following definition of "clear and convincing":

> ["Clear and convincing" is] that weight of proof which "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts" of the case.

*Crowe v. Smith*, 261 F.3d 558, 565 (5th Cir. 2001).

> vexatiously, wantonly, or for oppressive reasons. In this regard, if a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.

*Chambers*, 501 U.S. at 45–46; 111 S.Ct. at 2133 (internal citations and quotation marks omitted).

Similarly, courts may sanction a party that either knowingly made a false response to a discovery request, or knowingly assisted someone else in making or concealing a false response. *Crowe v. Smith*, 151 F.3d 217, 237 (5th Cir.1998).

Case-terminating sanctions represent an extreme remedy that must be supported by "a clear record of delay or contumacious conduct," *and* a determination that "lesser sanctions would not serve the best interests of justice." *Snider v. L-3 Commc'ns Vertex Aerospace, L.L.C.*, 946 F.3d 660, 678 (5th Cir.2019) (citations omitted) (discussing dismissal, with prejudice, as a sanction). Perjury constitutes "contumacious conduct." *Id*. (citation omitted).[7] However, "[i]t is not a party's negligence—regardless of how careless, inconsiderate, or understandably exasperating—that makes conduct contumacious; instead, it is 'the *stubborn resistance to authority*' which justifies a dismissal with prejudice." *Brown v. Oil States Skagit Smatco*, 664 F.3d 71 (5th Cir.2011) (quoted source omitted).

"Like other sanctions, attorney's fees certainly should not be assessed lightly or without

---

[7] A witness testifying under oath or affirmation violates the federal perjury statute if he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87; 113 S.Ct. 1111, 1116 (1993) (citing *inter alia*, 18 U.S.C. § 1621(1)).

fair notice and an opportunity for a hearing on the record." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767; 100 S.Ct. 2455, 2464 (1980).   Moreover, "[t]he district court must demonstrate some connection between the amount of monetary sanctions it imposes and the sanctionable conduct by the violating party . . ." *White v. Reg'l Adjustment Bureau, Inc.*, 647 Fed. App'x. 410, 412 (5th Cir. 2016) (quoted source omitted).   Here, LIMU received fair notice, via the instant motion, that it could be subject to sanctions.   However, LIMU did not request a hearing on the record.   Accordingly, the court will decide the matter on the evidence submitted by the parties.

    b)  <u>Discussion</u>

    For over one year now, Plaintiffs, via counsel, have been telling LIMU, and its attorneys, that LIMU's discovery responses pertaining to Plaintiffs' downlines were missing significant distributors.   Until December 2, 2020, LIMU, and its attorneys, consistently represented to Plaintiffs, and to the court, that Plaintiffs were mistaken, and that no data was missing or had been manipulated.   In fact, at the November 16, 2020, contempt hearing, LIMU's former employee and current consultant, Rich Dadisman, testified that the LIMU_5_1_2018 database had the sponsoring information and downline information for the Pardues still intact.   He added that the LIMU_5_1_2018 database was a "snapshot in time of the entire business as of 5/1/2018 . . . prior to having made significant changes into the sponsorship tree."

    As it turns out, only six days before he made the May 1, 2018 "backup" copy, Dadisman, apparently at the request of someone else at LIMU, reassigned the Rusty Barton leg out of Ocean Sky's downline and into the downline of another promoter, Brent Palmer.   This movement

included approximately 41,000 promoters and represented 28 percent of Ocean Sky's downline. *See* Decl. of Ted Tatos [doc. # 300-4].

Dadisman endeavored to explain this inconsistency in his February 2, 2021 declaration, wherein he averred that, in December 2019 when LIMU_002727 was provided to Plaintiffs, he did not recall when he had been asked to move the Rusty Barton leg out of Ocean Sky's downline.  (R. Dadisman Decl.; LIMU Opp., Exh. [doc. # 300-5]).   He also proffered two reasons for why he did not consider the movement of 41,000 promoters to be "significant":   1) because he moved the Barton organization in full, without making additional changes; and 2) because he knew that Rusty Barton had resigned from LIMU in 2016.   *Id.*

Once Plaintiffs finally confirmed that the data LIMU had produced, e.g., the LIMU_5_1_2018 database, did not accurately capture all of Plaintiffs' downline at the time LIMU terminated their distributorships, one would expect some measure of embarrassment and contrition from LIMU.   Instead, LIMU has emphasized that Plaintiffs knew of the discrepancies all along and had the ability to cobble together the complete downline via other databases.   In other words, no harm, no foul.   LIMU further characterized any misstatements or errors on its part or on behalf of its consultant as "unfortunate," or "innuendo."   LIMU also adduced evidence to show that the movement of downlines to avoid "orphaned" promoters after a distributor departs the organization is a normal part of the MLM business.   *See* Tatos Decl.

In an effort to negate the appearance of nefarious intent behind LIMU's discovery practices, LIMU's expert, Ted Tatos, opined that the movement of over 40,000 promoters out of Ocean Sky's downline was unlikely to go unnoticed by Plaintiffs.   (Tatos Decl., pgs. 21 [doc. #

300-4]).[8]   Tatos also speculated that the exclusion of the Barton leg from Ocean Sky's downline might have decreased LIMU's damages on its counterclaim against Ocean Sky to a greater extent than what LIMU stood to gain from a reduction of Plaintiffs' damages in the latter's case-in-chief.  *Id*.

The foregoing notwithstanding, several considerations weigh against attributing LIMU's erroneous discovery denials to mere negligent oversight.   First, within thirty minutes after its principal, Gary Raser, was served with this lawsuit, LIMU transferred a significant portion of Ocean Sky's downline out from Ocean Sky and to another promoter, who had provided evidence favorable to LIMU in support of Ocean Sky's termination.   While LIMU suggests that such downline realignments were common in the MLM industry, it is unlikely that the timing of the movement of the Rusty Barton leg was mere coincidence.

Second, in response to Ocean Sky's original motion to compel, LIMU never adduced evidence to dispute Ocean Sky's contention that LIMU's data production was deficient. Thereafter, when the court ordered LIMU to make the databases available to Plaintiffs via screenshare, LIMU declined to provide the names of the distributors associated with the distributor numbers, which clearly made it more difficult for Ocean Sky to establish that LIMU had manipulated its downline.

Third, at the hearing, LIMU's consultant, Rich Dadisman, misrepresented to the court

---

[8]  Albeit, it appears that until after December 2, 2020, Tatos, himself, did not realize that some of the database(s) previously produced by LIMU omitted the Barton leg from Ocean Sky's downline.  *Id*.

that the LIMU_5_1_2018 database contained the downline information for the Pardues still intact before any "significant" changes were made to the sponsorship tree.   As the court later learned, Dadisman, while still employed by LIMU, had moved approximately 41,000 promoters out of Ocean Sky's downline only six days before the May 1, 2018 backup of the organization was created.   In his post-hearing declaration, Dadisman said that he did not recall the timing of the move in December 2019.   However, he did not state that his memory was similarly faulty in November 2020, when he testified at the hearing.   Furthermore, Dadisman's post hoc rationale for why he did not consider the movement of 41,000 promoters to be significant is simply not credible.

Finally, LIMU failed to proffer any explanation or description of events to show how, in early December 2020, only after the court had required it to turn over backup copies of the databases, that it finally came to the realization that it had moved the Rusty Barton leg out of Ocean Sky's downline, and that it needed to produce a new report, LIMU_13784, that listed Ocean Sky's downline prior to the movement of 41,000 distributors.   Given LIMU's steadfast denials of data movement and inaccuracies up until that point, one would expect some explanation for this dramatic turn of events.   LIMU, however, remained mum.   Instead, LIMU disingenuously argued that Plaintiffs were not materially prejudiced because they knew all along that LIMU had manipulated the data – LIMU's denials, notwithstanding.

Upon consideration of the existing record, the undersigned finds by clear and convincing evidence that LIMU moved a significant portion of promoters out of Plaintiffs' downline, and then stymied Plaintiffs' efforts in discovery to obtain an accurate representation of their

downline prior to the manipulation.   The court is not prepared to find that Rich Dadisman committed perjury at the November contempt hearing.   However, his statements to the court were misleading and inaccurate.   Furthermore, LIMU did not disavow Mr. Dadisman's testimony or otherwise endeavor to promptly notify the court of the errors.

The undersigned is acquainted with LIMU's discovery lapses in this case, and, overall, they do not cast LIMU in a favorable light.   However, the court is not yet persuaded that LIMU remains incorrigible, beyond redemption, and/or that lesser, monetary sanctions are incapable of motivating LIMU to abide its discovery obligations.   Accordingly, before resorting to more draconian, case-dispositive sanctions, the court once more will employ monetary sanctions to compensate Plaintiffs for the consequences of LIMU's bad faith discovery practices, and to persuade LIMU to be more open and honest with its interactions with opposing parties and the court.   The court also would be remiss if it failed to remind defense counsel of their obligations under Rules 3.3, 3.4 and 8.4 of the Louisiana Rules of Professional Conduct.   *See* LR 83.2.4 (adopting the Rules of Professional Conduct of the Louisiana State Bar Association).[9]

Plaintiffs' counsel expended $3,000 (10 hrs. x $300/hr.) for purposes of researching and filing the instant motion for sanctions.   (Decl. of C. Wellman; M/Sanctions, Exh. [doc. # 275]). Furthermore, Plaintiffs' expert, Derk Rasmussen, expended $13,228.50 (55.93 hrs. x $236.52/hr. blended billing rate) to review documents produced by LIMU and to summarize the

---

[9] The court may impose necessary sanctions against a pro hac vice attorney not only directly, but also through "the bar of which the pro hac vice lawyer is a member, as well as through the local lawyer with whom he is associated."   *Sanders v. Russell*, 401 F.2d 241, 246 (5th Cir. 1968).

discrepancies.   (Decl. of D. Rasmussen; M/Sanctions, Exh. [doc. # 275-1]).   Plaintiffs' counsel also expended $4,200 (14 hrs. x $300/hr.) to review Defendants' opposition briefs and to prepare and file a reply brief.   (Decl. of C. Wellman; Reply Brief, Exh. [doc. # 306-1]).   In addition, Plaintiffs submitted a reply declaration prepared by Mr. Rasmussen at a cost of $9,348 (34.7 hrs. x 269.39/hr. blended billing rate).   (Rasmussen Reply Decl. [doc. # 309]).   Finally, Plaintiffs' counsel spent $1,050 (3.5 hrs. x $300/hr.) reviewing and drafting a response to Defendants' sur-reply, as amended.   (C. Wellman Decl.; Pl. Opp. Brief, Exh. [doc. # 316-1].   In sum, Plaintiffs have incurred a total of $30,826.50 in attorney's fees and costs associated with the instant motion for sanctions.

The court is aware that LIMU contests some of the costs claimed by Plaintiffs stemming from Mr. Rasmussen's work.   However, consistent with Defendants' request, the undersigned intends to permit revised reports from the damages experts for both sides, premised upon the corrected versions of Plaintiffs' downlines.   As such, some of the work already performed by Plaintiffs' damages expert on his own report, and in response to Defendants' expert report, will be rendered redundant and outdated.   Plaintiffs should receive at least some compensation to cover the cost of this exercise that was materially undermined by LIMU's bad faith discovery practices.   To this end, and, in an effort to sway LIMU into a more open, transparent, and faithful adherence to good faith discovery and litigation practices, the undersigned will recommend that a sanctions, fees, and costs award of $50,000 be assessed against LIMU and in favor of Plaintiffs.

**Conclusion**

For the above-assigned reasons,

IT IS RECOMMENDED that Plaintiffs' motion for sanctions pursuant to the court's inherent authority [doc. # 272] be GRANTED-IN-PART and that Plaintiffs/Defendants-in-Counterclaim, Ocean Sky International, Inc. ("Ocean Sky") and Suni Enterprises, Inc. ("Suni") be awarded sanctions, costs, and fees in the total sum of $50,000, payable within seven (7) days after entry of judgment, with proof of payment filed in the record immediately thereafter.

IT IS FURTHER RECOMMENDED that the motion for sanctions [doc. # 272] otherwise be DENIED, at this time, subject to the court's authority, at trial, to accommodate any material prejudice suffered by Plaintiffs as a result of any failure to preserve evidence.

Under the provisions of 28 U.S.C. '636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party=s objections within **fourteen (14) days** after being served with a copy thereof.   A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.   Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY=S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN**

**ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 16th day of April, 2021.

_____

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE

34